# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **LOYD EKSTRAND,** | } |
| **Plaintiff,** | } |
| v. | } Case No.: 2:23-cv-00820-RDP |
| **MARTIN O'MALLEY, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,** | } |
| **Defendant.** | } |

## MEMORANDUM OF DECISION

Plaintiff Loyd Ekstrand brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claims for a period of disability and disability insurance benefits ("DIB"). *See also* 42 U.S.C. § 405(g). Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

**I.      Proceedings Below**

Plaintiff filed his application for a period of disability and DIB on May 31, 2020. (Tr. 232-34). The claim was denied initially on October 5, 2021, and upon reconsideration on February 15, 2022. (Tr. 104, 115). Plaintiff then requested and received a hearing before Administrative Law Judge Emilie Kraft ("ALJ") on September 13, 2022. (Tr. 52-77, 124-25, 188). In her decision, dated November 22, 2022, the ALJ determined that Plaintiff has not been under a disability within the meanings of §§ 216(i) or 223(d) since June 24, 2020. (Tr. 11-26). After the Appeals Council

denied Plaintiff's request for review of the ALJ's decision on April 20, 2023 (Tr. 1), that decision became the final decision of the Commissioner, and therefore a proper subject of this court's appellate review.

At the time of the hearing, Plaintiff testified that he was 46 years old; he has a high school education. (Tr. 57). Plaintiff previously worked as a parts inspector, bench grinder, automotive team leader, warehouse worker, and returned goods repairer. (Tr. 69-70). Plaintiff alleges that he suffers from the following: traumatic brain injury ("TBI"); a broken right femur; a dislocated right knee; a torn right PCL; a broken left tibia; a broken left fibula; a broken right wrist; a broken right clavicle; chronic pain in his right ankle, left knee, upper left thigh, and right wrist; a loss of dexterity in his right hand; arthritis in his left knee and right hand; short-term memory issues; and anxiety. (Tr. 268, 349). According to Plaintiff, he has been unable to engage in substantial gainful employment since June 24, 2020. (Tr. 56).

In December 2014, Plaintiff was involved in an automobile accident, in which he sustained the following injuries: a broken femur in three places; a dislocated left knee; a torn PCL in his left knee; a broken right tibia and fibula in thirteen places; a broken right arm and wrist in three places; a broken collarbone; and TBI. (Tr. 58, 444). At the time of the accident, Plaintiff was working as the team leader of an assembly line in the automotive industry. (Tr. 58). As a result of the accident, Plaintiff could not work for nine months and had to go to physical therapy to relearn how to walk and use his hands. (Tr. 59, 62). Plaintiff returned to work in 2015 and assumed the same position he held prior to his accident until he stopped working in June 2020 because he "couldn't deal with the pain anymore." (Tr. 59). Plaintiff initially alleged that his disability onset date was December 13, 2015, and that he had been unable to engage in substantial gainful employment since that date. (Tr. 102, 235). However, because Plaintiff returned to work after the original alleged onset date,

Plaintiff amended his onset date during the hearing to allege that he had been unable to engage in substantial gainful employment since June 24, 2020. (Tr. 56).

Plaintiff states that he left his job in 2020 for a host of physical reasons, including that he began falling at work. (Tr. 59). He complains that he needs a knee replacement in his left knee, but doctors have warned him against the surgery because the risk of infection is too high due to the hardware in his knee after the accident. (Tr. 60). As a result of his left Knee pain, Plaintiff states that he cannot walk or stand for more than 20-30 minutes at a time and must put most of his weight on his right leg. (Tr. 59-60). But, because his right fibula and tibia were broken in the car accident, Plaintiff alleges that this only transfers pain from his left knee to his right ankle that has plates and screws in it. (Tr. 59-60). In addition, Plaintiff complains that he cannot get on his knees at all; has difficulty lifting objects, bending down, and stooping; and can only sit in a chair for 20-30 minutes before his legs swell and his back begins hurting. (Tr. 59, 64).

Further, Plaintiff complains of pain in his right hand due to arthritis. (Tr. 61). Because he had plates and screws placed in his right hand and wrist after the automobile accident, he states that he has lost a lot of sensation and dexterity in his hand, tends to drop anything over five pounds, and has issues picking up small items such as coins or buttons. (Tr. 59-61). Further, he complains that his right ring finger locks up without warning. (Tr. 61).

In addition, Plaintiff states that he struggles with mental and emotional issues from his TBI, including short-term memory loss. (Tr. 59-61). To combat this, he keeps detailed lists to stay on task and has difficulty focusing for more than 20-30 minutes at a time. (Tr. 61-62). Further, he complains of posttraumatic stress disorder ("PTSD") and anxiety that worsens when he is in large groups of people and that causes him to experience waking nightmares. (Tr. 61). Although he

generally gets along well with others, Plaintiff states that he gets stressed and lashes out if more than a few people are around him. (Tr. 62).

Since his accident, Plaintiff has seen numerous physicians to help navigate his pain and his physical and neurological problems. He regularly sees Dr. Beretta, a pain specialist (*i.e.*, every two months for the past seven years). (Tr. 62-63, 1109-122, 1155-160). Dr. Beretta prescribes Plaintiff Celebrex for arthritis and Norco for pain, and he takes these medications three times a day. (Tr. 63-64, 1086). But, Plaintiff complains that the Norco tends to make him slightly nauseous unless he eats. (Tr. 64). In addition, Plaintiff takes Clozapine at night for his PTSD, which tends to make him groggy. (Tr. 64). Dr. Beretta's pain management treatment notes do not show any change in Plaintiff's physical examination prior to the alleged onset date and throughout the period at issue. (Tr. 1085-95, 1109-122, 1155-160).

In January 2015 -- a few weeks after the automobile accident -- Plaintiff was examined by Dr. Martin Rahn Setliff and complained of symptoms of confusion, impulsiveness, increased agitation, and memory impairment related to his TBI. (Tr. 444). Dr. Setliff's examination notes show that Plaintiff was cooperative and alert and oriented to location and month, but did not know the year. (Tr. 446). After examining Plaintiff a few days later, Dr. Setliff noted that his confusion had improved, although it was still present. (Tr. 441). Dr. Setliff recommended starting Plaintiff on Amantadine for his TBI. (Tr. 442). In addition, Dr. Setliff noted that Plaintiff did not need medication to treat his agitation, but instead recommended that Plaintiff wean off his pain medication and remain in environments with low lighting and low noise to decrease those symptoms. (Tr. 442).

In March 2015, Plaintiff's review of symptoms was negative for psychiatric problems. (Tr. 663). Dr. Robert Brunner noted that Plaintiff's mental status was oriented, that his mood was

stable, and that he possessed normal judgment. (Tr. 669-70). Plaintiff was instructed to stop taking Amantadine for his TBI. (Tr. 669). Additionally, Dr. Brunner stated that Plaintiff's TBI had improved to the point where he was cleared to return to work and drive. (Tr. 671). Plaintiff's general examinations, neurological examinations, and psychiatric examinations in the months following generally showed that he had no psychiatric problems and remained cooperative, alert, oriented, and stable in his mood. (Tr. 721, 728, 747, 749, 764, 776, 787-88). However, Plaintiff was prescribed Zoloft by his primary care physician in 2017 and remains on it now. (Tr. 1053-57).

In June 2020, Plaintiff presented to Dr. Robert C. Snyder, his primary care physician, with complaints of severe leg pain and requested a letter for work because of his knee. (Tr. 1053). At this appointment, Plaintiff was noted to have gained 23 pounds in the last year. (Tr. 1053). He was restarted on his weight loss medicine and issued a letter for work. (Tr. 1053).

In July 2020, Plaintiff visited orthopedic physician Dr. Michael Blum with complaints of extreme leg pain. (Tr. 1215). Specifically, Plaintiff complained of sharp throbbing, locking, swelling, and instability in both his left knee and right ankle. (Tr. 1215-216). Dr. Blum noted that Plaintiff had a normal gait, although x-rays revealed post-traumatic degenerative joint disease in his left knee. (Tr. 1216). The records indicate that Dr. Blum told Plaintiff multiple times (and documented) that he was able to work without restriction. (Tr. 1248, 1261, 1266). Plaintiff was referred to two additional specialists for his ankle and knee. (Tr. 1217, 1224-225).

One of the specialists was Dr. Elie Semaan Ghanem at UAB. (Tr. 967). During the physical examination, Dr. Ghanem noted that Plaintiff walked with a moderate limp. (Tr. 969). Further, Dr. Ghanem observed that Plaintiff had a range of motion of 5 degrees to 110 degrees and full motor function and sensory function. (Tr. 969). X-rays of Plaintiff's left knee showed moderate, tri-compartmental arthritis, but no joint effusion or fractures. (Tr. 969-70). At the end of the

examination, Dr. Ghanem gave Plaintiff an injection in his left knee and noted that a total knee arthroplasty was a possibility in the future if the injection did not help. (Tr. 969).

In June 2021, Plaintiff underwent a psychological consultative evaluation with Dr. John R. Haney. (Tr. 1096). Dr. Haney noted that Plaintiff took Zoloft each day to control his emotions and anger. (Tr. 1097). Dr. Haney's examination notes show that Plaintiff was well-oriented to person, place, and time during the interview, and that his speech was well-articulated and normal. (Tr. 1097). During the examination, Plaintiff stated that his greatest need was help with his ability to get around because his weight had increased to the point where he could not stand or walk. (Tr. 1098). Although Plaintiff complained during the examination that his short-term memory loss required him to write everything down and check lists numerous times, Dr. Haney noted that Plaintiff's memory appeared generally intact. (Tr. 1097-98). Particularly, Plaintiff was able to recall six digits forward and four backward, three of three objects after a delay, and perform several single and multiple-step mental arithmetic problems. (Tr. 1097-98). Dr. Haney concluded that Plaintiff's ability to attend, concentrate, and persist in employment seemed only mildly impaired by his brain injury, and that he could be expected to understand, remember, and carry out simple one or two-step job instructions. (Tr. 1098-99). However, Dr. Haney noted that Plaintiff's attendance, persistence, and pace at work may be impaired by anxiety and chronic pain and that he may face some difficulty tolerating work stress. (Tr. 1099).

Plaintiff also underwent a physical consultative evaluation with Dr. Abiodun Badewa in August 2021. (Tr. 1101-105). Dr. Badewa noted that Plaintiff's range of motion in his dorsolumbar spine is significant for reduced flexion, extension, right and left lateral flexion, and rotation. (Tr. 1104). He had normal range of motion in his right hip, right knee, left ankle, and shoulders/wrists, but reduced range of motion in his left hip, left knee, and right ankle. (Tr. 1104). However, Dr.

6

Badewa noted that Plaintiff had a normal gait and station. (Tr. 1104). Further, Plaintiff's examination revealed normal dexterity and grip strength and no clubbing, cyanosis, or edema in any of his extremities. (Tr. 1102, 1104). Dr. Badewa also noted that Plaintiff appeared alert and oriented, had normal motor and cognitive function, and that his thought process was logical. (Tr. 1104-105).

In May 2022, Plaintiff began seeing a mental health specialist at River Region Psychiatry Associates. (Tr. 1123). Plaintiff complained of anxiety, depression, and problems with crowds since his automobile accident. (Tr. 1123). Further, Plaintiff stated that he had trouble sleeping, which caused him to be irritable and have a low tolerance for frustration. (Tr. 1126). At the initial appointment, Plaintiff was prescribed Zoloft, Seroquel, and Abilify to take daily. (Tr. 1127). The mental health specialist also instructed Plaintiff to begin psychotherapy and referred him to a sleep study. (Tr. 1126). When he returned for a follow-up appointment a month later, Plaintiff stated that his mood and sleep quality had improved since beginning the medication, but he still complained of struggles with agitation, anxiety, and nightmares. (Tr. 1129). In July 2022, Plaintiff noted that he "fel[t] better depression-wise" since starting medication, while still having nightmares. (Tr. 1134). Throughout all of his appointments, the mental health specialist noted that Plaintiff's thoughts appeared organized, his knowledge and judgment were good, and that his memory had no limitations. (Tr. 1126, 1131).

Plaintiff states that, in a normal day, he wakes up each morning to feed the family dogs, let them outside, and ensure that his son makes it on the bus for school. (Tr. 66). He states that he spends 4-5 hours a day in a recliner with his feet elevated to keep the swelling down in his legs and take the pain off of his feet from standing. (Tr. 64-65). Plaintiff is able to make himself "just about anything" to eat and, although his wife handles the majority of the indoor chores, he assists

with some light chores around the house, such as sweeping the deck and doing laundry. (Tr. 67, 365, 373). He states that, because of his memory problems, he sets alarms to remember to do certain things, writes down spoken instructions, and can only pay attention for 10–15-minute intervals at a time. (Tr. 373, 376). Plaintiff states that he is able to drive, but does not go anywhere on a regular basis. (Tr. 67).

At the hearing, the ALJ asked a vocational expert ("VE") to assume a hypothetical individual of the same age, education, and employment history as Plaintiff who could only perform sedentary work with the following limitations: the hypothetical individual could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, and crouch; never crawl or reach overhead with the right upper extremity; frequently handle, finger, and feel with the right upper extremity; and could have no exposure to unprotected heights, hazardous machinery, or commercial driving. (Tr. 70-71). The VE testified that the hypothetical individual would not be able to perform any of Plaintiff's past work, but that there were sufficient sedentary work opportunities for such an individual, such as a document preparer, bill sorter, and order clerk for food and beverage. (Tr. 71). The ALJ then asked if these jobs would still be available if the hypothetical individual had the same limitations as above and the following: the individual could understand and remember simple instructions; can maintain attention and concentration to carry out simple instructions in at least two-hour intervals over an eight-hour workday; and can adapt to occasional changes in the work environment. (Tr. 72). The VE noted that, even with the parameters of the hypothetical adjusted to account for simple instructions, simple tasks, and occasional changes, all of these jobs would remain available. (Tr. 72).

Finally, the ALJ asked if there would be any work at the sedentary level (or any other level) for a hypothetical individual who could sit for no more than two hours in an eight-hour workday,

and stand and walk for no more than one hour each in an eight-hour workday. (Tr. 72). The VE stated that these limitations would eliminate all full-time work opportunities for the individual, because the individual would not be able to meet the full eight-hour workday requirements as defined by Social Security law. (Tr. 72).

## II.   ALJ Decision

Disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is engaging in substantial gainful activity.  *Id.* § 404.1520(a)(4)(i). "Substantial gainful activity" is defined as activity that is both "substantial" and "gainful." *Id.* § 1572.  "Substantial" work activity is work that involves doing significant physical or mental activities. *Id.* § 404.1572(a). "Gainful" work activity is work that is done for pay or profit. *Id.* § 404.1572(b). If the ALJ finds that the claimant engages in activity that meets both of these criteria, then the claimant cannot claim disability.  *Id.* § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. *Id.* § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may not claim disability. *Id.*  Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See id.* §§ 404.1520(d), 404.1525, and 404.1526.  If such criteria are met, the claimant is declared disabled. *Id.* § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite his impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ

9

determines whether the claimant has the RFC to perform past relevant work. *Id.* § 404.1520(a)(4)(iv). If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled. *Id.* If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step. *Id.* § 404.1520(a)(4)(v). In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with his RFC, age, education, and work experience. *Id.* § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his RFC, age, education, and work experience. *Id.* §§ 404.1520(g), 404.1560(c).

The ALJ found that Plaintiff has not engaged in substantial gainful activity since June 24, 2020, and that he had acquired sufficient quarters of coverage to remain insured through December 31, 2025. (Tr. 14). Based upon the medical evidence presented, the ALJ concluded that Plaintiff has the following severe impairments: TBI; multiple fractures status post orthopedic surgeries; left femur fracture status post open reduction internal fixation ("ORIF"); right radius fracture; depressive disorder; PSTD; and obesity. (Tr. 14). In addition, the ALJ found that Plaintiff has non-severe impairments of hypertension and obstructive sleep apnea. (Tr. 15). Nevertheless, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15).

Next, the ALJ evaluated Plaintiff's testimony and found that Plaintiff's descriptions of the intensity, persistence, and limiting effects of his symptoms were inconsistent with the objective medical evidence, his treatment regimen and response to treatment, and his daily activities. (Tr. 19). After consideration of the entire record, the ALJ determined that Plaintiff has the RFC to

perform sedentary work as defined in 20 C.F.R. § 404.1567(a) with the following exceptions: he can occasionally climb ramps and stairs; he can never climb ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, and crouch; he can never crawl; he can never reach overhead with the right upper extremity; he can frequently handle, finger, and feel with the right upper extremity; he can have no exposure to unprotected heights, hazardous machinery, or commercial driving; he can understand and remember simple instructions; he can maintain attention and concentration to carry out simple instructions in at least two hour intervals over an eight-hour workday; and he can adapt to occasional changes in the work environment. (Tr. 17-18).

Based on this RFC, the ALJ concluded that Plaintiff is unable to perform any past relevant work and that transferability of job skills is not material to the determination of disability. (Tr. 24). *See* 20 C.F.R. Part 404, Subpart P, Appendix 2; SSR 82-41. Yet, the ALJ further found that there are a significant number of jobs in the national economy Plaintiff can perform when considering his age, education, work experience, and RFC. (Tr. 24). Thus, the ALJ ruled that Plaintiff is not disabled as that term is defined in the Act, and, therefore, is not entitled to a period of disability or DIB. (Tr. 26).

### III. Plaintiff's Argument for Remand

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the denial of review by the Appeals Council, reversed and remanded for consideration. (Pl.'s Mem., Doc. # 13 at 16). Plaintiff argues that remand is appropriate because the ALJ failed to articulate why portions of Dr. John Haney's psychological consultative examination findings were not included in the RFC. (Pl.'s Mem., Doc. # 13 at 8).

11

## IV. Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id*. (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V. Discussion

After careful review, the court concludes that the ALJ's decision is supported by substantial evidence and that she applied the law correctly.

### A. The ALJ's determination of Plaintiff's RFC is supported by substantial evidence.

A claimant's RFC is an assessment of the claimant's ability to do work despite his impairments. *Matos v. Comm'r of Soc. Sec.*, 2022 WL 97144, at *5 (11th Cir. 2022) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 404.1545(a)). In formulating an RFC, the ALJ considers a claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). To do this, the ALJ examines all relevant medical and other evidence, including "any statements about what [the claimant] can still do that have been provided by medical sources," as well as "descriptions and observations" by the claimant, his family, his neighbors, his friends, or others, of his limitations, including limitations resulting from pain. *Matos*, 2022 WL 97144 at *5; 20 C.F.R. § 404.1545(a)(3).

Plaintiff's argument centers around his psychological consultative examination with Dr. John Haney in August 2021; therefore, the court briefly summarizes Dr. Haney's findings. Dr. Haney's examination notes show that Plaintiff was well-oriented to person, place, and time during the interview, and that his speech was well-articulated and normal. (Tr. 1097). Although Plaintiff reported experiencing increased anxiety since his automobile accident in 2014, he noted that he had never been psychiatrically hospitalized or received any specialized mental health treatment. (Tr. 1097). Plaintiff complained during the examination that his short-term memory loss requires him to write everything down and check lists numerous times. (Tr. 1097-98). In contrast to this testimony, Dr. Haney observed that Plaintiff's memory appeared generally intact. (Tr. 1098). Plaintiff was able to recall six digits forward and four backward, three of three objects after a delay, and perform several single and multiple-step mental arithmetic problems. (Tr. 1097-98). Ultimately, Dr. Haney concluded that Plaintiff's ability to attend, concentrate, and persist in employment seemed only mildly impaired by his brain injury; that he could be expected to

understand, remember, and carry out simple one or two-step job instructions; and that his attendance, persistence, and pace at work may be impaired by anxiety and chronic pain and that he may face some difficulty tolerating work stress. (Tr. 1098-99).

The ALJ evaluated Dr. Haney's medical opinion and found it to be generally persuasive. Specifically, the ALJ noted:

> The examiner opined that [Plaintiff's] ability to attend, concentrate, and persist in employment seemed mildly impaired by [his] brain injury. He appeared able to relate to other people adequately and could be expected to understand, remember, and carry out simple one or two-step job instructions. His ability to maintain customary attendance, persistence, and pace appeared impaired by anxiety and chronic pain, and some difficulty tolerating work stress might be expected (Exhibit 13F). The opined limitations, which are generally consistent with the retained ability to perform simple work activity, are supported by findings upon examination. For example, [Plaintiff] retains the ability to drive, play video games, and watch after his 10-year-old son. His mental status examination was essentially unremarkable. In addition, the limitations are consistent with the evidence of record as a whole, which includes medication management of [Plaintiff's] mood systems by his primary care provider until he, very recently, established with a mental health provider. Furthermore, [Plaintiff] went back to work for several years after the accident doing the same job he was doing prior, with earnings well above the minimum wage threshold for substantial gainful activity.

(Tr. 22). After making this finding and considering the other medical opinions and evidence in the record, the ALJ arrived at the following RFC:

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. [§] 404.1567(a) except he can occasionally climb ramps and stairs; he can never climb ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, and crouch; he can never crawl; he can never reach overhead with the right upper extremity; he can frequently handle, finger, and feel with the right upper extremity; he can have no exposure to unprotected heights, hazardous machinery, or commercial driving; he can understand and remember simple instructions; he can maintain attention and concentration to carry out simple instructions in at least two hour intervals over an eight-hour workday; he can adapt to occasional changes in the work environment.

(Tr. 17-18).

Plaintiff argues that reversal and remand is appropriate in this case because the ALJ failed to include portions of Dr. John Haney's psychological consultative examination opinion in his RFC. (Pl's Mem., Doc. # 13 at 8). The crux of Plaintiff's argument is that, because the ALJ found Dr. Haney's opinion to be generally persuasive, she erred by not including (and articulating why she did not include) Dr. Haney's limitations that (1) Plaintiff should be limited to one-to-two-step instructions and (2) Plaintiff had an impaired ability to maintain customary attendance, persistence, and pace in his RFC. (Pl's Mem., Doc. # 13 at 11).

As an initial matter, the court notes that in making this argument, Plaintiff cites to numerous cases finding reversible error where the ALJ gave "great" or "significant" weight to a medical opinion stating that a claimant could follow one-to-two-step instructions but assessed an RFC that only limited the claimant to simple, routine tasks. (Doc. # 13 at 13-14). But, these cases all involve claims asserted before March 27, 2017, and, thus, before the promulgation of 20 C.F.R. § 404.1520c. They are therefore inapposite to this dispute. Under § 404.1520c, when evaluating claims filed on or after March 27, 2017 (like the one here), an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id.* at § 404.1520c(a). Instead, the ALJ evaluates the medical opinion using the factors listed in § 404.1520c(c)(1)-(5) and determines only if the medical opinion is persuasive. *Id.* Even if the ALJ deems an examiner's opinion to be persuasive, that does not make it binding. *See Hollingsworth v. Comm'r of Soc. Sec.*, 846 F. App'x 749, 753 (11th Cir. 2021) ("A claimant's RFC is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter is considered, it is not dipositive.").

Further, this argument erroneously equates the term "persuasive" as synonymous with "controlling." The two terms are not the same. Indeed, numerous courts have held that an ALJ's reference to an opinion as persuasive does not make it binding, and that the regulations do not require an ALJ to adopt every part of an opinion she finds persuasive into an RFC. *See Sanders v. Comm'r of Soc. Sec.*, 2022 WL 970181, at *5 (M.D. Fla. 2022); *Freyhagen v. Comm'r of Soc. Sec.*, 2019 WL 4686800, at *8 (M.D. Fla. 2019); 20 C.F.R. § 416.920(c). Rather, "the assessment of a claimant's RFC is within the exclusive province of the ALJ." *Sanders*, 2022 WL 970181 at *5 (citing 20 C.F.R. § 416.946(c)); *see also Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 486 (11th Cir. 2012) ("A claimant's [RFC] is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive.").

By way of example, in *Mato*, the claimant argued that the ALJ committed reversible error in determining her RFC because the RFC did not contain the exact limitations discussed by the state agency's psychologists, nor did the ALJ explain the reasoning for such omissions. 2022 WL 97144 at *6. Specifically, the claimant pointed to the psychologists' medical opinions that the claimant would need frequent support with planning and goal setting and could have only "limited and superficial social interaction" in the workplace due to her psychological disorders. *Id.* Although the ALJ specifically identified the state psychologists' opinions as persuasive to her analysis (*id.* at *2), she ultimately found that the claimant was able to perform a full range of work at all exertional levels; could perform simple, routine, and repetitive tasks; and could occasionally interact with supervisors, coworkers, and the public. *Id.* at *6. The claimant argued that the ALJ's RFC finding was legal error because it was inconsistent with the very medical opinions the ALJ found to be persuasive. *Id.* The Eleventh Circuit disagreed. *Id.*

Our circuit made clear that an ALJ's RFC determination is proper so long as it is supported by substantial evidence, even if it ultimately differs from the conclusions of a medical opinion the ALJ refers to as persuasive. *Id.* Specifically, the court found that because the ALJ stated that she had carefully considered the entire record, including the medical opinions and prior administrative medical findings, in making her determination, the RFC was supported by substantial evidence. *Id.* That is what occurred here.

The ALJ stated that she fully considered all medical opinions and prior administrative findings when evaluating Plaintiff's claims and determining his RFC. (Tr. 21). Notably, the ALJ made abundantly clear that her ultimate findings were deduced from a myriad of sources and, as a result, would differ even from those medical opinions she considered to be persuasive:

> It is important for the reader to understand that a medical opinion is a statement from a medical source about what a claimant can still do despite his or her impairments and whether he or she has one or more impairment-related limitations or restrictions in abilities to perform certain demands of work (20 C.F.R. 404.1513(a)(2)). **Of note, the undersigned rarely finds opinions to be simply "persuasive" or "not persuasive," either accepting them word-[f]or-word or rejecting them altogether. There are almost always discrepancies, however small, between the specific opinions and limitations noted by a medical source or administrative medical finding, and the limitations reflected in the claimant's [RFC]. Any such discrepancies are based on the undersigned's independent review, consideration of the claimant's testimony, and all other evidence in the claim, some of which may not have been available to the source at the time of the expressed opinions.**

(Tr. 21-22) (emphasis added). Therefore, contrary to Plaintiff's contention otherwise, the ALJ clearly provided an explanation for the differentiation between her conclusions and those of the medical experts. *See Matos*, 2022 WL 97144 at *6. And, although Plaintiff argues that the ALJ erred because the RFC did not include Dr. Haney's limitations that Plaintiff (1) should be limited to one-to-two-step instructions and (2) had an impaired ability to maintain customary attendance, persistence, and pace, substantial evidence in the record supports the ALJ's findings.

As to Plaintiff's first argument, that the ALJ erred in not limiting him to jobs with only one or two-step instructions, there is substantial evidence in the record to support the ALJ's finding that Plaintiff can remember and follow simple instructions. (Tr. 18). Although Plaintiff complained that he struggled with short-term memory loss, numerous doctors noted that his memory appeared generally intact. (Tr. 1097-98, 1126, 1131). During Plaintiff's psychological examination with Dr. Haney, Plaintiff was able to find abstract similarities between pairs of objects, interpret proverbs, provide accurate current event information, and name any requested public figure. (Tr. 1097). Further, Dr. Haney noted that Plaintiff was able to recall six digits forward and four digits backward from a specific number. (Tr. 1098). And, notably, Plaintiff successfully remembered numerous objects after a delay and "provided reasonably detailed recent and remote memory information." (Tr. 1098). Examinations by other physicians confirmed these same findings. For example, Dr. Badewa's records show that Plaintiff was alert and oriented, his cognitive function was fully intact, and his thought process was logical. (Tr. 1104-105). Similarly, Plaintiff's mental health provider noted on numerous occasions that Plaintiff's recent and remote memory was without limitation and that his thought process was organized and intact. (Tr. 1126, 1128, 1131, 1134).

Plaintiff's work history and his own testimony provide further support for the ALJ's finding that Plaintiff is capable of understanding and remembering simple instructions, not just one-to-two-step directions at a time. Notably, less than a year after the automobile accident that caused his TBI, Plaintiff returned to his job and resumed the exact same duties he had previously held and worked there for five more years. (Tr. 59, 65). In addition, Plaintiff stated that he prepares meals for himself and his family daily, and that he can "fix just about anything"—including hamburgers, sandwiches, and other basic meals. All these activities involve multiple ingredients

and steps for preparation. (Tr. 67, 364, 373). Each day, he is responsible for getting his son on the school bus, taking care of the family's three dogs, and doing small chores around the house. (Tr. 66-67, 373). He admitted to being able to pay bills, count change, handle a savings account, and use a check book. (Tr. 374). He is able to drive himself and abide by applicable traffic laws. (Tr. 374). And, he spends a large portion of his days playing video games. (Tr. 375, 1098). All of this evidence, taken together, provides substantial evidence that Plaintiff is capable of following simple instructions. *See Williams v. Acting Comm'r of Soc. Sec.*, 649 F. App'x 1000, 1002 (11th Cir. 2016) (finding that an ALJ's decision to discount a medical examiner's opinion that the plaintiff was mentally disabled and instead find that the plaintiff had the mental capacity to work was supported by substantial evidence because the plaintiff could do household chores, yardwork, manage money, and drive).

Similarly, substantial evidence supports the ALJ's finding that Plaintiff has the ability to maintain customary attendance, persistence, and pace at work. Less than five months after his automobile accident, Plaintiff was deemed to be "doing well from a head injury aspect" and was cleared to work and drive. (Tr. 669-71). Notably, Plaintiff returned to work and resumed the exact same role he held prior to his accident, thus demonstrating firsthand his ability to maintain the same attendance, persistence, and pace that he held before his injury. (Tr. 65). Since that time, numerous physicians have examined Plaintiff and observed that he was goal directed and his thought process was logical. (Tr. 1098, 1105, 1134). Indeed, Plaintiff's orthopedic physician made clear on numerous occasions that Plaintiff can work without restriction. (Tr. 1248, 1261, 1266). Furthermore, Plaintiff currently maintains daily duties around his house, such as dog care, sweeping off the deck, getting his son to the bus, and cooking meals. (Tr. 66-67, 373). All of this evidence also supports a finding that Plaintiff can maintain customary attendance, persistence, and

19

pace at work. *See Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1325-326 (11th Cir. 2021) (plaintiff's daily activities of being able to personally take care of herself, drive a car, perform light yardwork, and assist her family with household chores evidence an ability to maintain a routine and pace).

Ultimately, the assessment of a claimant's RFC is within the exclusive province of the ALJ. *Beegle*, 482 F. App'x at 486. As the Eleventh Circuit has made clear, an ALJ's RFC determination is proper -- even if it ultimately differs from the conclusions of a medical opinion the ALJ refers to as persuasive -- if it is supported by substantial evidence. *Mato*, 2022 WL 97144 at *6. Based on the foregoing, the court finds that substantial evidence supports the ALJ's RFC determination, and the ALJ did not err in excluding some of Dr. Haney's limitations from Plaintiff's RFC.

## VI.     Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this determination. The Commissioner's final decision is therefore due to be affirmed. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this July 2, 2024.

_____
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE